### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| WARREN BARRINGER, JR., | ) | |
| | ) | CASE NO. 1:13CV1061 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Warren Barringer, Jr. ("Barringer") challenges the final decision of the Acting

Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a

Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security

Income ("SSI") under Title(s) II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i),

423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent

of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

### I.  Procedural History

On April 13, 2010, Barringer filed applications for POD, DIB, and SSI, alleging a

disability onset date of February 1, 2008 and claiming he was disabled due to learning disabilities and high blood pressure.  (Tr. 157-164, 194.)  His applications were denied both initially and upon reconsideration.  (Tr. 72-82, 85-97.)  Barringer timely requested an administrative hearing.  (Tr. 100.)

On November 22, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Barringer, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-71.)  On January 12, 2012, the ALJ found Barringer was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 11-21.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-5.)

## II.  Evidence

***Personal and Vocational Evidence***

Age thirty-seven (37) at the time of his administrative hearing, Barringer is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963(c).  He has a ninth grade education and past relevant work as a warehouse worker and janitor.  (Tr. 20, 195.)

***Hearing Testimony***

During the November 22, 2011 hearing, Barringer testified to the following:

- He left school after the ninth grade.  (Tr. 33.)

- In the past, he lived "house to house," staying with various friends and family.  He now lives with his uncle, who is a stroke victim.  He used to help take care of his uncle, but can no longer do so because his own illnesses have gotten worse.  (Tr. 39-40.)

- His daughter helps take care of him and his uncle.  She does the laundry and cooks.  He goes shopping with his daughter and sometimes does the dishes.  He drives but only when he is not taking his medication, as it makes him drowsy.  (Tr. 40-41.)

2

- Between 2003 and 2008, he obtained work through various temporary agencies as a warehouse worker and janitor. As a warehouse worker, he unloaded trucks. This job required him to be on his feet "most of the time" and to lift between 10 and 15 pounds. As a janitor, he mopped and buffed floors, and emptied garbage cans. This job required him to be on his feet about 70% of the time and to lift up to 50 pounds. (Tr. 43-46.) He has not worked since 2008, except for a one-day assignment in 2009 at a factory doing warehouse work. (Tr. 41-42.)

- In 2005, he experienced a "full stroke" and was in the hospital for five days. This stroke caused chronic pain and weakness in his left side, from his shoulder down to his foot. He did not seek follow-up medical care because he did not have insurance. He returned to work but had difficulty controlling the buffer and mopping with both hands. He had to work at a slower pace and was reprimanded by his supervisor. (Tr. 47-48, 54-55.)

- He experienced another stroke approximately one year later. This stroke caused his left hand to become "disfigured;" i.e. his left hand curves to the left, his right hand is straight, and, therefore, his left hand is not parallel to his right hand. This makes it difficult for him to pick up objects. (Tr. 55-56.)

- As a result of his strokes, he continues to experience weakness in his left hand. He has difficulty grasping and picking up objects. He also "has been known to drop" things. (Tr. 54-55.) It would be "a strain" for him to lift a gallon of milk with his left hand. His dominant hand is his right hand. (Tr. 48.)

- He experiences numbness and throbbing pain in his left hip as a result of his strokes. (Tr. 56.) His right ankle also causes him pain. It "throbs and swells" and he is sometimes unable to put on a boot or shoe. (Tr. 49.) He cannot afford prescription pain medication and takes Tylenol instead. (Tr. 58.)

- He can stand for 10 to 15 minutes before his left side begins to tremble and shake. He can only walk about 20 to 30 feet before he has to sit down due to his right ankle pain. (Tr. 57.)

- He is 6 feet tall and weighs 319 pounds. His weight exacerbates his ankle pain and makes it difficult for him to bend down, climb stairs, stoop, crouch, bend, and kneel. (Tr. 60-63.) He also sometimes experiences shortness of breath. (Tr. 62.)

- He has been hearing voices "for a long time." (Tr. 50.) He "suppressed it" throughout the years but started hearing them more often after his strokes and the death of his father in 2007. (Tr. 50.) He did not seek medical attention for this issue because he was embarrassed and thought it would go away on its own. (Tr. 50, 59.) However, "it got worse over the years" and, in September 2011, he

3

"decided that I really need to seek help." (Tr. 59.)

- He takes Geodon to help suppress the voices. He also takes Trazodone to help with his "sleep disorder." These medications make him sleepy, dizzy, and nauseous. (Tr. 49.) If he does not take his medications, he hears voices "constantly," starting about twenty minutes after he wakes up. (Tr. 50, 58.)

- His auditory hallucinations have caused him to withdraw from his family and friends. He does not go around people anymore and cries a lot. (Tr. 58-59.) He feels "unfortunate to have the ailments that I have and I wish that I can be better and be back to myself and get my old self back." (Tr. 60.) He "just [does not] understand what's going on with me and it, and it makes me not want to be around anybody, of embarrassment." (Tr. 60.)

- He is very weak in math, reading, and writing. He can count money, but cannot measure things or do simple multiplication or fractions. He also has difficulty keeping count of items. He is not able to read well. He has gotten by at work mostly with help from his co-workers. He needs help writing. The mother of his children has filled out job applications for him. He is not computer literate. He was let go from his last job because they said he needed a high school diploma. (Tr. 51-53.)

The VE testified Barringer had past relevant work as a (1) warehouse worker (medium, SVP 2); and, (2) janitor (medium, SVP 2.) (Tr. 64.) The ALJ then posed the following hypothetical:

My first hypothetical, I'd like you to consider a person with the same age, education and past work as the Claimant, who is able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk two hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull; could occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally stoop, kneel, crouch and crawl; can also occasionally perform left handling and fingering and is right hand dominant; and must avoid concentrated exposure to hazards such as machinery and heights. Would this individual be able to perform the Claimant's past work, relevant work as those jobs are generally performed in the national economy?

(Tr. 64-65.) The VE testified that such a hypothetical individual would not be able to perform

Barringer's past relevant work, but could perform other jobs such as charge account clerk

4

(sedentary, SVP 2); food and beverage order clerk (sedentary, SVP 2); and, addresser (sedentary, SVP 2).  (Tr. 65.)

The ALJ then posed a second hypothetical that was the same as the first, but added the limitation that "this hypothetical individual would be off task approximately 15 percent of the time due to side effects from medication." (Tr. 65-66.)  The VE testified such an individual would not be able to perform any of the previously identified jobs or any other jobs.  (Tr. 66.)

Barringer's attorney then referred to "Exhibit 2F/1, which is an RFC evaluation by a State consultant,"[1] and posed the following hypothetical:

Q:      And, most specifically, add to the hypothetical that the Court has given
        you, Mr. Burkhammer, and he would have    you're talking moderate level.
        I know that's not the vocational term.  I'd say it    I'll qualify that, but at
        least the way that seems to be modified is that it has a noticeable effect
        with regard to carry out activities within a schedule, maintain regular
        attendance and be punctual within normal tolerance.  He would have
        noticeably   noticeable deficiencies in that area.

ALJ:    The problem we have is the term moderate.  It's not * * defineable and if
        you can either take it to him being off task in those areas or if it would be
        frequent, occasional, but those kind of terms are at least definable.

BY ATTORNEY:

Q:      Well, we're talking about in a schedule, maintain regular attendance, be
        punctual, again, I'll say 15 percent of the time.

A:      Okay.  Then, then it would apply to the Judge   the Judge's off task 15
        percent and I would say there would be no jobs.

(Tr. 66-67.)

_____

[1]  This Exhibit is a Mental RFC Assessment completed by state agency psychologist, Karen Steiger, Ph.D., on August 4, 2010.  (Tr. 257-260.)  Among other things, Dr. Steiger found that Barringer was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 257.)

Finally, the ALJ posed a third hypothetical that was the same as the first, but added the limitation that "this hypothetical individual, in addition, can perform simple, routine tasks that have a static routine and do not require interaction with the general public and would have superficial interaction with co-workers and supervisors."  (Tr. 67.)  In response to the ALJ's question whether this limitation would change the three jobs previously identified, the VE testified as follows:

> A:     It, it would eliminate the charge account clerk job, Your Honor, and when you're saying interaction, are you talking about face-to-face interaction or does it include phone contact?
>
> Q:     It would be probably any interaction with the general public.
>
> A:     Then the only, the only that I would give, and I have no other examples, would be the addresser job.
>
> Q:     Okay.  So the addresser job is the job?
>
> A:     Yes.
>
> Q:     Okay.  Okay.  And there's no other?
>
> A:     That's right, Your Honor.

(Tr. 68.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

6

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Barringer was insured on his alleged disability onset date, February 1, 2009, and remained insured through the date of the ALJ's decision.  (Tr. 11.)  Therefore, in order to be entitled to POD and DIB, Barringer must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

---

[2]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Barringer established medically determinable, severe impairments, due to hypertension, status-post cerebrovascular accident, history of right ankle dislocation and surgery, obesity, adjustment disorder with depressed mood and anxiety disorder (social phobia), and unspecified psychosis; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 13- 16.)  Barringer was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work.  (Tr. 16-21.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Barringer was not disabled.  (Tr. 20-21.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in

the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

9

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

### *Manipulative Limitations*

In his first and third assignments of error, Barringer argues the ALJ erred in failing to find him disabled on the basis of his left hand manipulative limitations. Citing Social Security Ruling ("SSR") 96-9p, 1996 WL 374185 (July 2, 1996), Barringer maintains most unskilled sedentary jobs require good use of both hands and fingers; i.e. bilateral manual dexterity. (Doc. No. 17 at 25.) He asserts the RFC is not supported by substantial evidence because the record demonstrates he "sustained a significant manipulative limitation of his ability to work with small objects with both hands by virtue of his left handed limitations." (Doc. No. 17 at 26.) He also argues "[t]he ALJ's reliance on the [VE's] testimony to find the Plaintiff not-disabled was not supported by substantial evidence because the only job that the [VE] could cite required manipulative ability which the Plaintiff not longer possesses." *Id.* Specifically, Barringer argues he is unable to perform the job of addresser because the Dictionary of Occupational Titles ("DOT") defines that job as requiring more than occasional handling. *Id.* at 23. Based on these related arguments, Barringer maintains the ALJ's decision is not supported by substantial evidence.

The Commissioner argues the ALJ recognized and accounted for Barringer's manipulative limitations in his non-dominant left hand in formulating the RFC. She asserts Barringer never sought medical treatment for pain or weakness in his left hand since he allegedly began

10

experiencing these symptoms in 2005. In addition, the Commissioner notes the medical consultative examiner found only a small diminishment of muscle strength in Barringer's left hand and, further, that two non-examining state agency physicians concluded he "was capable of performing work-related activities despite his limitations." (Doc. No. 18 at 12.) Finally, the Commissioner argues the VE was "more than aware of Plaintiff's non-dominant left hand limitations, as the ALJ explicitly stated these limitations in her hypothetical." *Id*. at 13.

A claimant's RFC is the most that he can still do despite his functional limitations. 20 C.F.R. § 404.154(a); SSR 96-8p. The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions. 20 C.F.R. § 404.1546(c). The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence. *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical

11

evidence before rendering a residual functional capacity finding." *Poe*, 2009 WL 2514058 at * 7.

The medical and opinion evidence regarding Barringer's left hand limitations consists of the following. On December 26, 2005, Barringer presented to the emergency room with complaints of right arm and leg weakness for three hours. (Tr. 335.) He reported that "he [then] started to have left-side arm paresthesia and weakness, along with right leg weakness and pins-and-needles sensation which started in his right foot." *Id*. He was admitted to the hospital for several days, during which time he reported decreasing weakness and paresthesia. *Id*. An EKG showed sinus tachycardia, and a CT scan indicated a "tiny low density area in the left parietal" which "might be part of ischemic infarct." (Tr. 336.) Barringer also underwent a chest x-ray, MRI, and MRA. *Id*. The chest x-ray "showed a picture of cardiomegaly and infiltrate." *Id*. The MRI was negative, but the MRA "showed that there is segmental narrowing of the anterior and posterior cerebellar arteries." *Id*. Barringer's final diagnosis was "transient ischemic attack which is resolved." *Id*. It was recommended that he "needed to be followed." *Id*.

The record reflects Barringer returned to the emergency room on January 1, 2006, complaining of numbness to the right side of his face. (Tr. 350.) It appears, however, that Barringer declined to be admitted to the hospital and left without receiving treatment. (Tr. 351.)

Barringer does not direct this Court's attention to any evidence in the record indicating he obtained further medical treatment for his left-sided weakness.[3] During the hearing, he testified he suffered a second stroke in December 2006 which resulted in chronic pain and weakness in

---

[3] The record does contain treatment records indicating Barringer visited the emergency department in April and November 2010 for complaints of back and ankle pain, respectively. (Tr. 275-284, 311-317.) As these records do not relate to his left-sided weakness or other stroke-related issues, they will not be discussed in this Opinion.

his left side from his shoulder down to his foot. (Tr. 54-56.) Barringer also testified his second stroke caused his left hand to become "disfigured," which he described as follows: "my left hand curves to the left and my right hand is straight. It's not parallel with my right hand." (Tr. 56.) He testified this deformity causes him to have difficulty grasping and picking up objects. *Id*.

The record contains three state agency opinions regarding Barringer's physical limitations that are relevant to this issue. The first is dated August 25, 2010, when Barringer underwent a consultative examination with Eulogio Sioson, M.D. In relating Barringer's medical history, Dr. Sioson noted as follows:

> [Barringer] had 2 strokes   first one was X'mas '06  and was hospitalized at St. Vincent Charity Hospital for 2 weeks with weakness in his left arm. His second stroke was in 12/07 and had weakness left side of face and the weakness in his left arm got worse   also had mild weakness in left lower extremity and some speech difficulty.  He stayed in the hospital for 2 weeks    no rehab

(Tr. 285.)[4] Dr. Sioson stated that Barringer reported a continuing "problem with weakness in his left hand." (Tr. 285.) He also noted Barringer was right-handed. (Tr. 286.)

On physical examination, Dr. Sioson observed limited range of motion on Barringer's left side due to "resistance and some pain," but "no heat, redness, swelling, subluxation [or] gross deformity of the joints." (Tr. 286.) He further noted Barringer "had 0 to 5 lb grip left   had difficulty buttoning and tying with weak pinch," and that "manual muscle testing showed left

---

[4] This history is somewhat puzzling. The medical records submitted to the ALJ indicate Barringer experienced his first stroke in December 2005 (rather than 2006) and was hospitalized for three days (rather than two weeks). (Tr. 335-336.) Moreover, Barringer does not direct this Court's attention to any medical records indicating he was hospitalized for a second stroke in December 2007. It is unclear from Dr. Sioson's report whether the medical history noted above was based on Barringer's self-reporting, or on an independent examination of his medical records. If the latter, it would appear many of Barringer's medical records were not presented to the ALJ and are not in the record before this Court.

sided weakness." (Tr. 286.) Specifically, muscle testing showed Barringer's right side was 5/5 (indicating "normal" strength") and his left side was 4/5 (indicating "good" strength). (Tr. 287.) Dr. Sioson diagnosed "hypertension/stroke  has residual mild weakness left side" and "some soreness on ROM of left side." (Tr. 286.) Based on his examination, Dr. Sioson concluded Barringer would be limited to sedentary work  (Tr. 286.)

In September 2010, state agency physician Gerald Klyop, M.D. reviewed Barringer's medical records and completed a physical RFC assessment. (Tr. 292-299.) Dr. Klyop noted Barringer had "no treating source." (Tr. 293.) He referenced Dr. Sioson's finding that Barringer "has some weakness in his left hand grasp and fine coordination" but "[his] right hand has normal grasp and fine coordination." (Tr. 293.) Dr. Klyop concluded Barringer was capable of lifting 50 pounds occasionally and 25 pounds frequently; standing, walking, and/or sitting 6 hours in an 8 hour work day; and was able to push and pull without limitation. (Tr. 293.) Dr. Klyop further offered that Barringer could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; but, could only occasionally balance and climb ladders, ropes and/or scaffolding. (Tr. 294.) He also found Barringer was unlimited in his abilities to reach in all directions (including overhead) and feel, but was reduced to occasional handling and fingering in his left hand.[5] (Tr. 295.) Ultimately, Dr. Klyop concluded Barringer "is able to do medium lifting with some restrictions fine and gross manipulation in his left hand." (Tr. 298.)

Finally, in March 2011, state agency physician Elizabeth Das, M.D., reviewed Barringer's

---

[5] Dr. Klyop's Assessment states Barringer was limited to occasional handling and fingering in his right hand, but this appears to be an error. (Tr. 295.) Earlier in his assessment, Dr. Klyop specifically notes Barringer has weakness in his left hand, and that his right hand is normal. (Tr. 293.)

records and completed a physical RFC Assessment.  (Tr. 323- 330.)  She concluded Barringer

could lift 20 pounds occasionally and 10 frequently; and, stand and/or walk for 2 hours and sit for

6 hours in an eight hour workday.  (Tr. 324.)  She found his push/pull capability was limited with

respect to his lower extremities.  (Tr. 324.)  Dr. Das further offered that Barringer could

occasionally stoop, crouch, crawl, and climb ramps and stairs; but never climb ladders, ropes,

and scaffolds.  (Tr. 325.)  Finally, Dr. Das found Barringer was limited to occasional handling

and fingering with his left hand.  (Tr. 326.)

     In the decision, the ALJ acknowledged Barringer's testimony that he suffers from

"significant weakness, pain and numbness throughout his left side as well as difficulty grasping

objects with his left hand, which is disfigured."  (Tr. 16.)  She also discussed the medical

evidence that he experienced two strokes that "left him with left-sided weakness and decreased

grasping abilities in the left hand."  (Tr. 17.)  The ALJ found that although Barringer's

impairments could reasonably be expected to cause his symptoms, his claims were not credible to

the extent they were inconsistent with the RFC.  (Tr. 17.)  In particular, the ALJ noted Barringer

had neither sought nor received ongoing medical treatment for any of his severe physical

impairments and the "medical evidence of record lacks objective findings that support the extent

of physical symptoms and limitations that the claimant has alleged."  (Tr. 17.)

     The ALJ then examined the opinion evidence.  With respect to Dr. Das' assessment, the

ALJ concluded that "[t]he majority of this evaluation is consistent with the credible evidence of

record, including the claimant's noticeably reduced abilities to lift, carry, sit, stand, and use his

left arm secondary to his history of suffering two strokes.  To this extent, the undersigned affords

this evaluation great weight."  (Tr. 18.)  The ALJ also afforded great weight to Dr. Sioson's

clinical findings of left sided weakness, but disagreed with his conclusion that Barringer could

perform a full range of sedentary work.  (Tr. 18.)  Finally, the ALJ accorded less weight to Dr.

Klyop's evaluation "as the credible evidence of record demonstrates that the claimant has

significantly greater restrictions in terms of his abilities to lift, carry, stand, and walk secondary

to his history of two separate strokes that left him with left-sided weakness and difficulty

grasping with the left hand." (Tr. 19.)

> The ALJ formulated the RFC as follows:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that his ability to perform a full range of sedentary exertional work is reduced by additional limitations. Specifically, the claimant can lift 20 pounds occasionally and 10 pounds frequently.  He can stand and walk for two hours out of an eight-hour workday and sit for six hours out of an eight hour workday.  The claimant has unlimited ability to push and pull.  He can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds.  The claimant can occasionally stoop, kneel, crouch and crawl.  He can occasionally perform left handling and fingering and is right hand dominant.  The claimant must avoid concentrated exposure to hazards such as machinery and heights.  Finally, he can perform simple routine tasks that have a static routine and do not require interaction with the general public, and he can have superficial interaction with coworkers and supervisors.

(Tr. 16.)

Barringer argues the above RFC is not supported by substantial evidence because the ALJ

failed to properly apply SSR 96-9p.  The purpose of SSR 96 9p is "[t]o explain the Social

Security Administration's policies regarding the impact of a residual functional capacity (RFC)

assessment for less than a full range of sedentary work on an individual's ability to do other

work."  SSR 96-9p, 1996 WL 374185 at * 1.  According to this ruling, "[a]n RFC for less than a

full range of sedentary work reflects very serious limitations resulting from an individual's

medical impairment(s) and is expected to be relatively rare." *Id*. However, it notes that "a

finding that an individual has the ability to do less than a full range of sedentary work does not

necessarily equate with a decision of 'disabled.'" *Id*. Rather, if the performance of past relevant

work is precluded by an RFC for less than the full range of sedentary work, "consideration must

still be given to whether there is other work in the national economy that the individual is able to

do, considering age, education, and work experience." *Id.*

> Of particular relevance herein, SSR 96-9p provides as follows:
>
> **Manipulative limitations**: Most unskilled sedentary jobs require good use of both
> hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small
> objects require use of fingers; e.g., to pick or pinch. Most unskilled sedentary
> jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any *significant* manipulative limitation of an individual's ability to handle and
> work with small objects with both hands will result in a significant erosion of the
> unskilled sedentary occupations base .... When the limitation is less significant,
> especially of the limitation is in the non-dominant hand, it may be useful to
> consult a vocational resource.

*Id*. at *8 (emphasis in original). In discussing the use of Vocational Resources, the ruling then

provides that:

> In more complex cases, the adjudicator may use the resources of a vocational
> specialist or vocational expert. The vocational resource may be asked to provide
> any or all of the following: An analysis of the impact of the RFC upon the full
> range of sedentary work, which the adjudicator may consider in determining the
> extent of the erosion of the occupational base, examples of occupations the
> individual may be able to perform, and citations of the existence and number of
> jobs in such occupations in the national economy.

*Id*. at * 9.

> The ALJ herein found Barringer was limited to occasional left handling and fingering. (Tr.

16.) As an initial matter, it is not clear from Barringer's brief whether he is challenging this

particular limitation as not supported by substantial evidence. To the extent he is raising such an argument, the Court rejects it. The manipulative limitation set forth in the RFC is consistent with the opinions of Dr. Das and Dr. Klyop, both of whom found Barringer capable of performing occasional left-handed handling and fingering. (Tr. 295, 326.) Moreover, this limitation is also consistent with the opinion of consultative examiner Sioson, who measured Barringer's left hand strength as 4/5 or "good." (Tr. 287.) While Barringer presented (and the decision acknowledged) some medical evidence and hearing testimony regarding his difficulties with left hand grasping and handling, the ALJ expressly noted Barringer had not provided any evidence of ongoing medical treatment or evaluation for this condition. (Tr. 17.) Indeed, Barringer does not direct this Court's attention to any physician opinion evidence suggesting he has functional limitations relating to his left hand weakness that are greater than those set forth in the RFC.

The Court also rejects Barringer's argument that the ALJ failed to properly apply SSR 96-9p in crafting the RFC. After concluding he was limited to occasional left handed handling and fingering, the ALJ consulted a VE and presented a hypothetical question that expressly incorporated this limitation. As noted above, the VE testified that a hypothetical individual with the limitations set forth in the eventual RFC, including the manipulative limitation at issue, would be capable of performing the job of addresser (sedentary, SVP 2.) (Tr. 65, 67-68.) The VE further indicated that, with respect to this position, there were approximately 300 jobs locally; 3,000 in Ohio; and, 80,000 nationally. (Tr. 65.)

While SSR 96-9p indicates that "significant" manipulative limitations will result in a "significant erosion of the unskilled sedentary occupational base," the ruling acknowledges that "[w]hen the limitation is less significant, **especially if the limitation is in the non-dominant**

18

**hand**, it may be useful to consult a vocational resource." SSR 96-9p, 1996 WL 374185 at * 8 (emphasis added). This is precisely what the ALJ did in the instant case. The ALJ presented the left hand manipulative limitation at issue to the VE in the hypothetical, and expressly noted the hypothetical individual was right hand dominant. (Tr. 65.) The VE then considered the extent of any erosion of the sedentary occupational base and provided an example of an occupation that such an individual could perform (i.e. addresser), citing the existence and number of jobs in that occupation in both the local, state, and national economies. (Tr. 65-68.) Thus, the Court finds the ALJ fully complied with SSR 96-9p in determining that Barringer was not disabled. *See Farmer v. Astrue*, 2008 WL 343254 at * 5-6 (S.D. Ohio Feb. 5, 2008)(finding ALJ properly applied SSR 96-9p where ALJ consulted a VE to determine whether sufficient jobs existed for claimant restricted to limited range of sedentary work, including occasional fine manipulation limitation); *Groves v. Comm'r of Soc. Sec.*, 2012 WL 10385 at * 8-9 (S.D Ohio Jan. 3, 2012) (same).

    Barringer maintains, however, that the ALJ erred in relying on the VE's testimony because he "could not perform the addresser job based on the Dictionary of Occupational Titles." (Doc. No. 17 at 23.) He notes the addresser job identified by the VE has the DOT Code 209.587-010 and argues the 587 descriptor means "handling." He further argues the definition of an addresser's duties implies bimanual handling. Because the ALJ found he could only occasionally finger and handle with his left hand, Barringer argues he is unable to perform the sole job identified by the VE and, therefore, should have been found disabled.

    The DOT defines the occupation of "addresser" as follows: "Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May

19

sort mail." *See* Dictionary of Occupational Titles (Volume I, 4th Ed., Revised 1991) at 180. The VE identified this occupation in his testimony as having an occupational code of 209.587-010. As explained in the DOT, the middle three digits of this code (i.e. 587) refer to the Workers Functions ratings of the tasks performed in the occupation. *See* Dictionary of Occupational Titles, Volume I (4th ed., Revised 1991) at Introduction, pp. xviii-xix. In the case of addresser, Barringer correctly states that the 7 in that occupation's 587 code refers to "handling." (Doc. No. 17-1 at 1.) Moreover, although cited by neither party, the Court notes that the *Selected Characteristics* companion to the DOT rates the addresser job as requiring "frequent" handling and fingering. *See Selected Characteristics of Occupations Defined in the Revised DOT* ("*Selected Characteristics*"), (U.S. Dept of Labor, 1993) at 347.[6]

The Court rejects Barringer's argument that the ALJ improperly relied on the VE's testimony to find Barringer could perform the position of "addresser." Although he argues summarily that he is "non-competitive" as an addresser because of his left hand limitations, Barringer cites no authority to support his implicit argument that the position of "addresser" cannot be performed by a right hand dominant individual who is limited to occasional left-hand handling and fingering. Notably, he does not direct this Court's attention to any provision in

---

[6] The Commissioner argues the DOT's definition of "addresser" indicates that the "handling" requirement for that position is "not significant." While the Commissioner cites a Westlaw citation for this aspect of the DOT definition (i.e. 1991 WL 671797), the Court is unable to locate this expanded definition in the DOT itself. Further, it appears to be directly contrary to the characterization of this position in the *Selected Characteristics* companion to the DOT, which rates the position of "addresser" as requiring "frequent" handling. *See Selected Characteristics*, at 347. The Court need not resolve this discrepancy, however. For purposes of this appeal, the Court will give Barringer every benefit of the doubt and presume that the addresser position identified by the VE requires frequent handling and fingering, as set forth in the *Selected Characteristics*.

either the DOT or the *Selected Characteristics* companion that supports this position, nor does he cite any regulatory provision or case law to this effect.  Here, the VE was presented with a hypothetical accurately setting forth Barringer's left hand limitation and right hand dominance. The VE considered this information and testified Barringer could perform the job of addresser. He further testified that his testimony was consistent with the DOT and the *Selected Characteristics* companion.  (Tr. 66.)  Barringer cites no authority to support his argument that the VE incorrectly concluded Barringer could perform this position.  Moreover, he does not contend the addresser occupation fails to offer a significant number of jobs as a matter of law. Accordingly, the Court finds the ALJ properly relied on the testimony of the VE to find that Barringer could perform the job of addresser and, therefore, was not disabled.

Barringer's first and third grounds for relief are denied.

### *Failure to Consider Medication Side Effects as part of Credibility Determination*

In his second ground for relief, Barringer argues the decision is not supported by substantial evidence because the ALJ failed to consider the side effects of his medication pursuant to SSR 96-7p, 1996 WL 362209 (July 2, 1996).[7]  (Doc. No. 17 at 24.)  The Commissioner argues Barringer failed to present any evidence indicating his medications caused debilitating side effects.  Moreover, she argues Barringer denied any side effects from his medication during a

---

[7] This SSR is entitled "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."  SSR 96-7p, 1996 WL 362209 (July 2, 1996). It "clarifies when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision." *Id*. at * 1.

21

medical appointment that occurred only six days prior to the hearing.  Finally, the Commissioner argues Barringer "has failed to demonstrate how the mere fact that the ALJ did not mention Plaintiff's bed-time side effects from his medication adversely affects the outcome of the ALJ's finding in this matter." (Doc. No. 18 at 15.)

A claimant's subjective statements concerning his symptoms are not enough to establish disability.  *See* SSR 96 7p, Introduction.  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *Id*.  If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id*.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96 7p, Purpose section; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Comm'r of Soc. Sec*., 373 F.Supp.2d 724, 733 (N.D.Ohio 2005) (stating that an ALJ should explain his or her credibility findings in terms of the

22

factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96 7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[8] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D.Wis.2005).

Here, the ALJ found Barringer's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible. (Tr. 17.) Specifically, she concluded Barringer was not credible in light of (1) the lack of objective findings supporting the alleged extent of his symptoms; (2) his failure to obtain ongoing medical treatment for any of his severe impairments; (3) the nature and extent of his activities of daily living; and, (4) his inconsistent statements regarding the onset date of his auditory hallucinations and illegal drug use. (Tr. 17-19.)

While the ALJ did not explicitly discuss medication side effects in her credibility

---

[8] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96 7p, Introduction; *see also Cross*, 373 F.Supp.2d at 732.

determination, the Court notes she did discuss this issue with Barringer during the hearing as follows:

> Q:   Are you on any medications right now?
>
> A:   Yes.
>
> Q:   What are you taking?
>
> A:   Trazodone for the   that's, it make me sleep because I, I don't have sleep, a sleeping disorder, and Geodon for the medical disorder.
>
> Q:   Okay.  How is the trazodone helping you with sleep?
>
> A:   It, it, it makes me sleep, but it, it also makes me dizzy and nauseous.
>
> Q:   Okay.
>
> A:   Both medications have the same effect.
>
> Q:   Okay. So the Geodon is doing the same?
>
> A:   Yeah.
>
> Q:   What is the Geodon helping you with?
>
> A:   It's supposed to be helping me to, to suppress me hearing voices throughout the day.
>
> Q:   Okay. Has it been working?
>
> A:   When I'm asleep, I, I, I can't hear nothing when I'm asleep but when I'm woke, after waking up about 20 minutes, then it starts back constantly.

(Tr. 49-50.)  Moreover, the ALJ included a limitation relating to Barringer's alleged medication side effects in one of the hypotheticals presented to the VE.  (Tr. 65-66.)  Finally, the Court notes the ALJ recited the proper regulations and SSR 96-7p in her decision, indicating she had considered the relevant factors in determining credibility.  (Tr. 16.)

24

The Court rejects Barringer's argument that remand is warranted because the ALJ failed to explicitly discuss his alleged medication side effects in the decision.  As the Sixth Circuit has noted, "'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"  *Kornecky v. Comm 'r of Soc. Sec.*, 2006 WL 305648 at * 10 (6th Cir. Feb. 9, 2006) (quoting *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).  *See also Smith v. Astrue*, 2012 WL 1232272 at * 7 (N.D. Ohio April 12, 2012).  Here, the ALJ discussed Barringer's side effects with him at the hearing and acknowledged both the relevant social security regulations and SSR 96-7p.  While the decision may not have explicitly mentioned medication side effects, the Court finds this is insufficient, in and of itself, to demonstrate that the ALJ failed to consider the issue in rendering her credibility determination.  Moreover, Barringer makes no attempt to articulate how he believes his testimony regarding medication side effects should have changed the decision.  This is particularly problematic here, where Barringer cites no medical or physician opinion evidence suggesting his medication side effects result in greater functional limitations than those set forth in the RFC.

Accordingly, and for all the reasons set forth above, the Court finds Barringer's second assignment of error to be without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: February 28, 2014